IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VAPOR TECHNOLOGY ASSOCIATION, IAN DEVINE, DEVINE ENTERPRISE INC., CHRISTOPHER AUSTIN, RISING SUN VAPORS LLC, OHMERICA LLC, ADAM WEBSTER, THE STEAM CO. LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLIE BAKER, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS, AND MONICA BHAREL, M.D., IN HER OFFICIAL CAPACITY AS DEPARTMENT OF PUBLIC HEALTH COMMISSIONER,<br><br>Defendants. | Civil Action No. 19-12048<br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
Telephone: (857) 321-8360
wfick@fickmarx.com
dmarx@fickmarx.com

Joseph M. Terry (*pro hac vice forthcoming*)
David Randall J. Riskin (*pro hac vice forthcoming*)
Whitney G. Woodward (*pro vice forthcoming*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
jterry@wc.com
driskin@wc.com
wwoodward@wc.com

*Counsel for Plaintiffs*

**TABLE OF AUTHORITIES**

INTRODUCTION ..................................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT ......................................................................................................................7

I.     PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER
IRREPARABLE HARM ABSENT AN INJUNCTION ....................................................8

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................10

     A.     The Emergency Order Violates the Dormant Commerce Clause. .........................11

     B.     The First Amendment Bars the Emergency Order's Ban on Displaying
Vaping Products. .................................................................................................14

III.    THE HARM TO PLAINTIFFS OUTWEIGHS ANY CLAIMED HARM TO
GOVERNOR BAKER AND COMMISSIONER BHAREL, AND THE PUBLIC
INTEREST FAVORS AN INJUNCTION .......................................................................16

CONCLUSION..................................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Bigelow v. Virginia,* 421 U.S. 809 (1975) ................................................................... 14

*Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977) ........................................ 11

*Elrod v. Burns,* 427 U.S. 347 (1976) ............................................................................ 10

*Engine Specialties, Inc. v. Bombardier Ltd.,* 454 F.2d 527 (1st Cir. 1972) .................... 9

*K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907 (1st Cir. 1989) ............................ 10

*Katt v. Dykhouse,* 983 F.2d 690 (6th Cir. 1992) .......................................................... 15

*National Association of Tobacco Outlets, Inc. v. City of Worcester,* 851 F.
    Supp.2d 311 (D. Mass 2012) ............................................................................. 15, 16

*Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation,*
    715 F.3d 1268 (11th Cir. 2013) ............................................................................. 17

*Pearson v. Fair,* 980 F.2d 37 (1st Cir. 1992) .................................................................. 8

*Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) .................................................... 11, 13

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12 (1st Cir. 1996) .......... 8, 10

*Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970) ......................... 9

*Tennessee Wine & Spirits Retailers Association v. Thomas,* 139 S. Ct. 2449
    (2019) ......................................................................................................................... 11

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27 (2d Cir.
    1995) ............................................................................................................................. 8

*Voice of The Arab World v. MDTV Medical News Now, Inc.,* 645 F.3d 26 (1st Cir.
    2011) ............................................................................................................................. 8

*Washington Mercantile Association v. Williams,* 733 F. 2d 687 (9th Cir. 1984) ........... 15

*Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008) .......................... 7

*Zogenix, Inc. v. Patrick,* No. 14-11689, 2014 WL 1454696 (D. Mass. Apr. 15,
    2014) ............................................................................................................................. 8

## THE CONSITUTION, STATUTES, AND RULES

House Bill 1902, 191st General Court of the Commonwealth of Massachusetts (2019)......................................................................................................................7

Local Civil Rule 7.1.....................................................................................................14

Massachusetts General Laws Chapter 270, § 6 (2018)...........................................7, 12

Massachusetts General Law Chapter 17, § 2A ............................................................5

Senate Bill 1279, 191st General Court of the Commonwealth of Massachusetts (2019)......................................................................................................................7

United States Constituion Article I, § 8 ....................................................................11

## OTHER AUTHORITIES

11A Charles A. Wright et al, *Federal Practice & Procedure* § 2948.1 (3d ed.)............................9

**INTRODUCTION**

Vapor Technology Association ("VTA"), an industry trade group, and Ian Devine and his corporation Devine Enterprise, Inc.; Christopher Austin and his corporations Rising Sun Vapors LLC and Ohmerica LLC; and Adam Webster and his corporation The Steam Co. LLC (collectively, the "Retailer Plaintiffs"), bring this motion to restrain and enjoin the Governor of the Commonwealth of Massachusetts, Charlie Baker, and the Commissioner of the Department of Public Health, Monica Bharel, M.D., from enforcing an unconstitutional "Emergency Order" banning the sale or display of nicotine "vaping products"—a popular, and substantially safer, alternative to smoking traditional cigarettes. The Order, purportedly enacted in response to a lung-disease outbreak that the Centers for Disease Control & Prevention principally attribute to black-market THC-based[1] vaping products, makes it unlawful to sell or display ***any*** vaping product in Massachusetts, whether containing THC or not. And although the Order cites concerns about underage use of vaping products, it contains no provisions relating to minors and is instead a blanket ban on the sale or display of these products to adults. This categorical ban runs afoul of the U.S. Constitution in at least two ways: by placing burdens on interstate commerce well in excess of any putative local benefit in violation of the Commerce Clause, and by prohibiting the "display" of lawful products in violation of the First Amendment.

The Emergency Order already has caused the closure of vapor-products retailers around the state. Unless enjoined, it will destroy the $331 million nicotine-vapor-products industry in Massachusetts, creating irreparable harm to the many law-abiding retailers, manufacturers, and distributors of these products located in (and out of) the State, as well as their employees. It also will heighten the health risks to the public, both by eliminating a safer alternative to smoking and

---

[1] "THC," short for tetrahydrocannabinol, is the chemical responsible for most of cannabis' psychological effects.

by forcing those who wish to use vapor products to obtain them on an unregulated black market—the very source of the health outbreak purportedly motivating the ban.

## BACKGROUND

The plaintiffs collectively are members of the nicotine-vapor-products industry that are being irreparably harmed by the Emergency Order. That Order, which Commissioner Bharel propounded, bans the sale and display of all vapor products in Massachusetts through January 25, 2020.

The Vapor Technology Association is a national, non-profit industry trade association of nicotine-vapor-products manufacturers and sellers, including those who are being harmed by the Massachusetts ban. Ian Devine is the owner of Devine Enterprise, Inc., a Massachusetts corporation that owns and operates two vapor-products retail stores in Massachusetts. The corporation's stores ceased operating on Thursday, September 25, after Devine received cease-and-desist orders pursuant to Defendants' ban. Christopher Austin is a Massachusetts resident who owns New Hampshire vaping-products retailers, which he owns through Rising Sun Vapors LLC and Ohmerica LLC. Austin advertises his products online in Massachusetts and purchases inventory for resale in his stores from a Massachusetts supplier. That supplier has a physical presence in Massachusetts. Adam Webster is a Connecticut resident who owns The Steam Co. LLC, a corporation that itself owns vaping stores in Connecticut and manufactures vaping products. He directs advertisements to Massachusetts residents and ships vaping products to Massachusetts.

Neither the Retailer Plaintiffs nor VTA's members manufacture or sell THC-related devices, like those black-market products at the center of the lung-disease outbreak. Instead, plaintiffs' products use nicotine, which in contrast to THC products, are regulated by FDA.

**A.** **A Brief Summary of Vaping Products.** Vaping devices (known also as "e-cigarettes") are handheld electronic devices that aerosolize a liquid mixture containing nicotine, cannabis-derived products, or other ingredients.[2] A user then inhales the aerosolized "vapor" as he or she would inhale actual cigarette smoke, but without the fire, flame, tar, carbon monoxide, or ash associated with traditional "combustible" cigarettes.[3]

Vaping products first gained traction in the United States in 2009 and present a safer alternative to combustible cigarettes. Many users of vaping products are current or former smokers.[4] An extensive body of research has demonstrated that vaping products pose substantially less risk than combustible cigarettes and thus may significantly reduce the public health harms associated with smoking. For example:

- A study of peer-reviewed literature conducted by the National Academies of Sciences, Engineering and Medicine (and commissioned by FDA) found that evidence suggests "across a range of studies and outcomes, e-cigarettes pose less risk to an individual than combustible cigarettes."[5]
- The United Kingdom's Royal College of Physicians advised that "the hazard to health arising from long-term vapour inhalation from the e-cigarettes available today is

---

[2] CDC, *About Electronic Cigarettes (E-Cigarettes)* (last revised Nov. 15, 2018), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/about-e-cigarettes.html (Exhibit 1).

[3] *See* Lee Smith et al., *E-Cigarettes: How 'Safe' Are They?*, 65 J. Fam. Practice 380 (June 2016), *available at* https://mdedge-files-live.s3.us-east-2.amazonaws.com/files/s3fs-public/issues/articles/content_a1a70ef370918fd2ba_JFP_06506_Article1.PDF.

[4] Nicholas Bakalar, *From 0 to 10 Million: Vaping Takes Off in the U.S.*, N.Y. Times (Aug. 31, 2018), https://www.nytimes.com/2018/08/31/health/vaping-cigarettes-nicotine.html (reporting that 54.6 percent of e-cigarette users also smoked cigarettes and that 30.4 percent of e-cigarette users had quit smoking cigarettes, according to a study by the CDC) (Exhibit 2).

[5] Kathleen Stratton et al., *Public Health Consequences of E-Cigarettes*, Nat'l Acads. Sci., Eng'r & Med. 12 (2018), *available at* https://www.ncbi.nlm.nih.gov/books/NBK507171/pdf/Bookshelf_NBK507171.pdf.

unlikely to exceed 5% of the harm from smoking tobacco."[6]

- A Georgetown University study concluded that switching from traditional cigarettes to vaping products would prevent millions of premature deaths over 10 years in the United States.[7]

- A randomized clinical study published in the *New England Journal of Medicine* found that cigarette smokers were more likely to quit smoking when using e-cigarettes than when using nicotine-replacement therapies.[8]

The availability of nicotine vapor products has coincided with a substantial drop in demand for traditional cigarettes. The CDC reports that the number of adult smokers as a percentage of the U.S. population dropped from 20.6% in 2008[9]—the year before vaping products gained traction in the United States—to 14% as of 2017.[10] And, perhaps relatedly, between June 2018 and June 2019, the sales of combustible cigarettes fell by more than 10%.[11] As Iowa Attorney General Thomas J. Miller and other public health officials explained to the

---

[6] Royal College of Physicians Tobacco Advisory Group, *Nicotine without Smoke: Tobacco Harm Reduction* (2009), *available at* https://www.rcplondon.ac.uk/projects/outputs/nicotine-without-smoke-tobacco-harm-reduction-0.

[7] Daniel T. Levy et al., *Potential Deaths Averted in USA by Replacing Cigarettes with E-Cigarettes*, 27 Tobacco Control 1 (2017), available at https://tobaccocontrol.bmj.com/content/27/1/18.

[8] Peter Hajek et al., *A Randomized Trial of E-Cigarettes Versus Nicotine-Replacement Therapy*, 380 New Eng. J. Med. 629–37 (2019), *available at* https://www.nejm.org/doi/10.1056/NEJMoa1808779.

[9] CDC, Morbidity & Mortality Weekly Report, *Cigarette Smoking among Adults & Trends in Smoking Cessation—United States, 2008* (Nov. 13, 2009), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5844a2.htm (Exhibit 3).

[10] CDC, *Current Cigarette Smoking among Adults in the United States* (last revised Feb. 4, 2019), https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (Exhibit 4).

[11] Letter from Thomas J. Miller to Alex M. Azar II, U.S. Secretary of Health & Human Servs. (July 24, 2019), at 2 & n.4, https://www.iowaattorneygeneral.gov/media/cms/PMTA_letter__190724__headed_45164DED1A0BA.pdf (citing a June 29, 2019, Wells Fargo Securities report) (Exhibit 5).

4

U.S. Secretary of Health and Human Services in July 2019, "[m]odeling the effects of e-cigarettes on smoking-related disease suggests that e-cigarettes should save millions of lives, even with pessimistic assumptions about unlikely untended consequences."[12]

**B.**     ***Vaping Products in Massachusetts.***     The vaping-products industry, which employs approximately 166,000 people nationwide, is a "dynamic part of the U.S. economy, accounting for $24.46 billion annually in economic output."  (Declaration of John Dunham (Sept. 30, 2019), ¶ 5 (Exhibit 6).)  More than $331 billion of that output is traceable to Massachusetts, where the vapor-products industry generates jobs for approximately 2,530 individuals.  (Dunham Decl. ¶ 6.)  Those individuals include the employees of 8 nicotine-vapor-products manufacturers, 1 nicotine-liquid-mixture manufacturer, and 221 retail vape shops.  (Dunham Decl. ¶ 7.)  Massachusetts vapor-products companies and sellers, and their employees, contribute nearly $19 million in state taxes; Massachusetts consumers of vaping products generate an additional $10.7 million in sales taxes.  (Dunham Decl. ¶ 9.)

**C.**     ***The Commonwealth's Ban on Vapor Products.***     On September 24, 2019, Governor Baker issued a two-page emergency declaration under Massachusetts General Law chapter 17, section 2A, citing concerns about "severe lung disease associated with the use of vaping products including but not limited to e-cigarettes."[13]  Those concerns were animated, it appears, by 530 cases of lung disease across 38 states that the CDC had confirmed.  (Emergency Declaration 1.)  Of those cases, Governor Baker identified five cases of lung injury in Massachusetts that met "the CDC definition of confirmed or probable cases."

---

[12] *Id.*

[13] Office of the Governor, *Governor's Declaration of Emergency* (Sept. 24, 2019), *available at* https://www.mass.gov/files/documents/2019/09/24/Governors-Declaration-of-Emergency.pdf, at 1 ("Emergency Declaration") (Exhibit 7).

(Emergency Declaration 2.)

The CDC and the FDA have since reported that the likely source of the lung disease is

black-market THC-based products.[14]  As FDA explained last week:

- During their ongoing investigation of that lung disease, state and government agencies have found that many of the vaping products contain THC, and that most samples found to contain THC tested also contain significant amounts of vitamin E acetate.

- Vitamin E acetate ordinarily is found in topical consumer products or dietary supplements; data about its effects after inhalation are limited.

- Although FDA currently lacks sufficient data to conclude that vitamin E acetate is the cause of the current rash of lung disease, the agency believes it is "prudent to avoid inhaling this substance."[15]

The CDC noted that in 77% of the cases, the patient admitted having used THC-based vaping

products,[16] and that in Wisconsin and Illinois, in which detailed patient interviews have been

conducted, a "high percentage of patients said they used products from Dank Vapes … 'the most

prominent in a class of largely counterfeit brands.'"[17]

The Governor also cited evidence of vaping among "youth" from 2017 and 2018, along

[14] Lena Sun & Laurie McGinley, *Most Vaping-Related Lung Injuries Linked to Marijuana Products, CDC Says*, Wash. Post (Sept. 27, 2019 4:52 PM), https://www.washingtonpost.com/health/2019/09/27/most-vaping-related-lung-injuries-linked-marijuana-products-cdc-says (Exhibit 8).

[15] FDA, *Lung Illnesses Associated with Use of Vaping Products* (revised Sept. 26, 2019), https://www.fda.gov/news-events/public-health-focus/lung-illnesses-associated-use-vaping-products (Exhibit 9).

[16] Cria G. Perrine et al., *Characteristics of a Multistate Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping—United States, 2019*, CDC, Morbidity & Mortality Weekly Report, (Sept. 27, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6839e1.htm (Exhibit 10).

[17] Isaac Ghinai et al., *E-Cigarette Product Use, or Vaping, Among Persons with Associated Lung Injury—Illinois & Wisconsin, April–September 2019*, CDC, Morbidity & Mortality Weekly Report (Sept. 27, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6839e2.htm (Exhibit 11).

with a December 2018 statement from the United States Surgeon General regarding youth vaping. (Emergency Declaration 2.) Nowhere in the declaration did the Governor acknowledge that Massachusetts already prohibits the sale or provision of "tobacco product[s]," which is defined to include vaping products, to individuals under 21 years of age. Mass. Gen. Laws c. 270, § 6(a), (b) (2018). Nor did the Governor acknowledge that the Massachusetts legislature earlier that year had considered, but failed to approve, legislation banning flavored vapor products. *See* S.B. 1279, 191st Gen. Ct. Mass. (2019); H.B. 1902, 191st Gen. Ct. Mass. (2019).

The same day, Commissioner Bharel and the Massachusetts Public Health Council approved an emergency order prohibiting:

> [t]he sale or display of all vaping products to consumers in retail establishments, online, and through any other means, including all non-flavored and flavored vaping products, including mint and menthol, including tetrahydrocannabinol (THC) and any other cannabinoid … in the Commonwealth.[18]

The Emergency Order makes no distinction between federally regulated nicotine vapor products and "black market" vaping products marketed under counterfeit brands or vaping products containing THC. (Emergency Order 1–2.) The Emergency Order went into effect immediately, and by its terms will remain in effect through January 25, 2020, unless either extended or the "declared public health emergency is terminated." (Emergency Order 2.)

## ARGUMENT

A temporary restraining order or preliminary injunction is appropriate where, as here, a party is likely to suffer irreparable harm in the absence of preliminary relief; the party's claim is likely to succeed on the merits; the balance of equities tips in its factor; and an injunction would

---

[18] Commissioner of Public Health, *Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019 Declaration of a Public Health Emergency* (Sept. 24, 2019), available at https://www.mass.gov/files/documents/2019/09/24/Order-of-the-Commissioner-of-Public-Health-Vaping-Products-9-24-19.pdf ("Emergency Order"), at 1 (Exhibit 12).

serve the public interest.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord*

*Voice of The Arab World v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).[19]

Because Plaintiffs "only [seek] to maintain the status quo pending a trial on the merits," rather

than "to alter the status quo by commanding some positive act," it faces a lesser burden to obtain

preliminary relief.  *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir.

1995); *see also Pearson v. Fair*, 980 F.2d 37, 45 (1st Cir. 1992) (explaining that "an injunction

that merely preserves the status quo may constitute *de minimis* relief").  Here, of course,

Plaintiffs seek only to preserve the pre-Emergency-Order state of affairs, pending a final

adjudication of the merits of that order.

## I.  PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

The devastating and irreparable harm that Plaintiffs—and Massachusetts vape shops

generally—will suffer is plain from the face of the Emergency Order.  For Massachusetts' $331

million vapor-products industry, it is an extinction-level event.  The Order imposes a categorical

four-month ban on the "sale or display of all vaping products to consumers in retail establishments,

online, and through any other means" in Massachusetts.  (Emergency Order 1.)  The ban, followed

by cease-and-desist letters, has already caused nicotine-vapor-products retailers across the state to

close their doors.  Any businesses that sell nicotine vapor products in addition to other products

will be required to reconfigure their stores and discard their now-prohibited stock.  Retailers have

already begun to lay off employees.  Each day the ban remains in place raises the likelihood that

those closures and layoffs will become permanent, and that the industry and livelihoods of the

thousands employed by it will be destroyed.  All "would lose incalculable revenues and sustain

---

[19] This analysis applies as well where a party seeks to enjoin a state official from implementing an "emergency" order.  *See Zogenix, Inc. v. Patrick*, No. 14-11689, 2014 WL 1454696, at *1 (D. Mass. Apr. 15, 2014) (preliminarily enjoining Massachusetts emergency order).

harm to . . . goodwill," which is irreparable harm. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).

For individual vape shop owners, the unexpected and prolonged loss of their business likely will lead to financial crisis and business ruin. The story of Ian Devine, owner of Devine Enterprise, Inc., which owns two nicotine-vapor-products stores in Massachusetts, is illustrative. His shops in Wapole and Mansfield have been shuttered since the Emergency Order—damaging in and of itself, and particularly so because Devine has personally guaranteed the long-term leases for the stores. (Declaration of Ian Devine (Sept. 25, 2019), ¶¶ 2–4 (Exhibit 13).) If the Emergency Order remains in place, Devine will be both deprived of his livelihood and personally responsible for paying Devine Enterprise's lease, one of which has more than four years remaining. (Devine Decl. ¶ 2.) Furthermore, if Devine is not permitted to reopen his shop soon, his five employees will be forced to find new jobs—as Devine will have to lay them off. (Devine Decl. ¶ 10.) Finally, the Emergency Order's ban continued effect will see Devine unable to get any return on the $100,000 he spent expanding his Wapole store. (Devine Decl. ¶ 3.)

This "threatened extinction" of vape shops as a result of the Emergency Order detailed by Mr. Devine—and which will play out across the hundreds of vape shops across Massachusetts—constitutes irreparable harm. *Engine Specialties, Inc. v. Bombardier Ltd.*, 454 F.2d 527, 531 (1st Cir. 1972); *see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (loss of the "right to continue a business" is an irreparable harm "not measurable entirely in monetary terms"); 11A Charles A. Wright et al., *Federal Practice & Procedure* § 2948.1 (3d ed.) ("[W]hen the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted. . . ."). Moreover, the sales ban and its companion display ban will injure vapor-products retailers outside of the state, who use

online advertisements to attract Massachusetts customers.  (Declaration of Adam Webster (Sept. 30, 2019), ¶¶ 3–4 (Exhibit 14).)

For all purveyors of vapor products, the Emergency Order's ban likely will harm the relationships they have formed with customers and the supply chains they have established with vapor-products wholesalers.  (Dunham Decl. ¶ 10; Declaration of Christopher Austin (Sept. 30, 2019), ¶ 10 (Exhibit 15).)  A company's inability to supply products as advertised can alienate actual and potential customers and "wreak substantial (but immeasurable) damage to the [company's] goodwill."  *Ross-Simons*, 102 F.3d at 19.  So too can it push customers to turn to competitors—like cigarette manufacturers—not laboring under the same handicaps.  *Id.*  This harm is irreparable.  *See, e.g.*, *id.*; *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("[H]arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found 'irreparable.'").

Finally, as discussed below, the Emergency Order's ban on the display of vaping products—which reaches beyond the borders of the Commonwealth through its express application to online advertisements of vaping products—violates plaintiffs' First Amendment rights to engage in commercial speech.  That is, itself, a form of irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The Emergency Order is unconstitutional for at least two reasons:

*First*, the Emergency Order violates the Dormant Commerce Clause because of its unjustified restraints on interstate commerce.  Its wholesale ban on sale and display on interstate commerce—which sweeps under its wings myriad products which are not responsible for vaping-related lung illnesses, and applies to persons of all ages—is clearly excessive when

compared to the ban's putative local benefits. *Second*, by banning the display of vaping products, the Emergency Order violates the First Amendment.

A. **The Emergency Order Violates the Dormant Commerce Clause.**

The Constitution expressly grants Congress the power to regulate commerce among the states. U.S. Const. Art. I, § 8, cl. 3. In addition to this affirmative grant of power, the Commerce Clause has a negative, or dormant, implication: It "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019) (internal quotation marks omitted); *see also Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 278 n.7 (1977) ("A State is … precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States."). That a state's regulation of interstate commerce may relate to public health or safety does not dispose of a dormant Commerce Clause problem; the regulation may be invalid when "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Through its wholesale prohibition on the sale or display of vaping products, the Emergency Order imposes burdens on commerce both inside and outside Massachusetts. The ban not only affects Massachusetts citizens, but also those individuals residing outside the state. Out-of-state residents no longer may travel to Massachusetts to purchase vaping products—even though the sale of products may be legal in their home states. Similarly, out-of-state business no longer may sell vaping products to Massachusetts residents through online or mail-order transactions. Measured against the marginal-at-best benefits worked by the overbroad Massachusetts ban, this burden on interstate commerce is clearly excessive.

Moreover, the Order bans all "display" of vaping products, precluding all online and print depictions of vaping products. That is true even if the advertisements seek to persuade

Massachusetts citizens to visit states where the sale of vaping products is lawful—a First Amendment problem as well, as detailed below. This is no small hindrance. For example, to comply with the "display" ban, out-of-state vapor-product retailers who maintain an online presence must either delete those images and advertisements, rendering them inaccessible to persons in *every* state, or somehow jury-rig their websites to be inaccessible to Massachusetts residents. Similarly, because the Emergency Order draws no distinction between intentional and unintentional displays, out-of-state entities must cease advertising in all print publications that might be brought or distributed into the state, lest they violate Massachusetts' regulation. The First Circuit already has held that bans of this type inflict an excessive, and thus unconstitutional, burden on interstate commerce. In *Consolidated Cigar Corp. v. Reilly*, the court held that cigar-advertising regulations violated the Dormant Commerce Clause because they "impose[d] liability on manufacturers for advertising in national magazines that are distributed in the Commonwealth, as well as for advertising on the Internet which can be viewed from a terminal in Massachusetts." 218 F.3d 30, 55–57 (1st Cir. 2000), *aff'd in part, rev'd in part on other grounds sub nom. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001). Indeed, the advertising bans in *Cigar Corp.* were "clearly excessive, even in relation to the Commonwealth's strong interest in informing consumers of health risks." *Id.* at 56.

The same is true with respect to the Emergency Order's ban on sale or display of vaping products. Two state interests purportedly animate the Governor's emergency declaration and the resulting emergency order. *First*, the declaration cites an increase in youth consumption of vaping products—a statement buttressed by studies from 2017 and 2018. (Emergency Declaration 2.) But Massachusetts *already* bans the sale of vaping devices, and indeed all tobacco products, to people under the age of 21. *See* Mass. Gen. Stat. c. 270, § 6. And if

Massachusetts believes it needs further regulation to address youth vaping, a narrower regulation targeting youths, rather than all persons, would allow Massachusetts to promote that interest "with lesser impact on interstate commerce." *Pike*, 397 U.S. at 142.

*Second*, the Emergency Order is predicated on Massachusetts' interest in addressing recent reports of illnesses "associated with vaping products, the specific cause [of which] is unknown." (Emergency Declaration 1.) Plaintiffs, of course, support the State's strong response to public health crises. But again, the Order's wholesale ban on all vaping products is drastically overbroad in light of the illnesses Massachusetts is confronting. Both FDA and the CDC have concluded from their review of initial data that most of the reported lung injuries present in patients who self-reported used vaping products containing THC and other cannabinoids.[20] Moreover, the CDC has acknowledged the likelihood that patients failed to disclose their use of THC to health officials investigating their cases.[21] Yet the Emergency Order bans the sale and display of *all* vaping products, regardless of their contents. Further, the Order fails to wrestle with its unintended (but easily foreseeable) public-health consequences. By banning many consumers' replacements for combustible cigarettes, the Order may spur those consumers to return to traditional cigarettes and thus the health problems associated with them. And by shutting down lawful shops selling FDA-regulated products, the Order may well drive

---

[20] *See* FDA, *Vaping Illnesses: Consumers Can Help Protect Themselves by Avoiding Tetrahydrocannabinol (THC)-Containing Vaping Products* (updated Sept. 6, 2019), https://www.fda.gov/consumers/consumer-updates/vaping-illnesses-consumers-can-help-protect-themselves-avoiding-tetrahydrocannabinol-thc-containing (Exhibit 16); CDC, *Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping* (Sept. 27, 2019, 1:00 PM), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html (Exhibit 17).

[21] CDC, *E-Cigarette Product Use, or Vaping, Among Persons with Associated Lung Injury— Illinois & Wisconsin, April–September 2019* (Exhibit 11).

consumers to the black-market and the very counterfeit products at the center of the lung-disease outbreak. The Order, in other words, is courting a significant public health crisis.

## B. The First Amendment Bars the Emergency Order's Ban on Displaying Vaping Products.

By its plain terms, the Emergency Order prohibits all retailers, whether located within Massachusetts or not, from even "display[ing]" vaping products online or "by other means," to internet users in Massachusetts.[22] Consequently, a retailer in New Hampshire, where the sale of vaping products is lawful, would nonetheless be barred from advertising those products online (or in print), if the advertising was available in Massachusetts. That is true even if the advertising simply invited Massachusetts residents to purchase vaping products lawfully in New Hampshire retail locations. So too would the Emergency Order bar an out-of-state manufacturer from advertising the superiority of its products without reference to a purchase location. The permutations are numerous and in each instance the restrictions are plainly unconstitutional. A state "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Bigelow v. Virginia,* 421 U.S. 809, 824–25 (1975). The Emergency Order's broad ban violates this fundamental constitutional principle.

Advertising is a form of commercial speech protected by the First Amendment. *See Lorillard*, 533 U.S. at 553. To determine whether a regulation has intruded on this protection,

---

[22] During undersigned counsel's Local Rule 7.1 conference the Office of the Attorney General informed Plaintiffs that at some point, perhaps this week, the Emergency Order will be amended in some manner to state that it does not apply to shipments out of state or to ban online displays. Without seeing the actual language that will be used, it is impossible to gauge the constitutionality of the amended order. And, in any event, that such modifications will take place in the future does not eliminate the Emergency Order's current unconstitutionality. Indeed, it only highlights that the statute as written cannot pass constitutional muster. Plaintiffs reserve the right to file an amended complaint, memorandum, and other associated papers if the Emergency Order is amended.

courts apply the four-part test from *Central Hudson Gas & Electric Corp. v. Public Service Commission*:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, [1] it at least must concern lawful activity and not be misleading. Next, we ask whether [2] the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether [3] the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

447 U.S. 557, 566 (1980).

Applying those four factors here, the Emergency Order's ban on "display[ing]" vapor products imposes an unconstitutional restriction on speech.

1.     The display of vaping products may concern lawful activity:  the sale of those products in states where their sale is permitted.  To the extent that the display of vaping products, for example through online advertising, "does not specifically promote a sale to occur in a jurisdiction where it is illegal—it would pass the first step of the *Central Hudson* test."  *Nat'l Assoc. of Tobacco Outlets, Inc. v. City of Worcester,* 851 F. Supp.2d 311, 314–15 (D. Mass 2012); *see also Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992); *Wash. Mercantile Assoc. v. Williams*, 733 F. 2d 687, 691 (9th Cir. 1984).  In *National Association of Tobacco Outlets*, although the City of Worcester had banned the sale of certain tobacco-related products, the Court held that "advertisements promoting such sales in the nearby city of Fitchburg (where such sales are apparently lawful) or an advertisement promoting such sales generally, without reference to location, is within the scope of First Amendment protection."  851 F. Supp. 2d at 314–15.  The same analysis applies here.

2.     Massachusetts lacks a substantial interest in preventing all advertising regarding vaping products within its borders.  The only conceivable rationale for banning, for example, the

online "display" of vaping products is that it would entice consumers to purchase those products, which the State deems to be dangerous. But in *Thompson v. Western States Medical Center*, the Supreme Court rejected "the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information." 535 U.S. 357, 374 (2002). And this Court has applied that holding to conclude that a locality has no substantial interest in "the protection of adults from tobacco advertising," *Nat'l Assoc. of Tobacco Outlets,* 851 F. Supp. 2d at 317, a conclusion that applies with equal force to vaping products.

3. The Emergency Order does not directly advance the government interest asserted. This Court has found that protecting adults from tobacco advertising cannot meet *Hudson*'s direct-advancement prong; thus, display bans that restrict advertisements "to prevent adults from purchasing a disfavored product" run afoul of the First Amendment. *Id.* at 318. But even if the Emergency Order directly advanced a permissible government interest *vis-à-vis* minors, it could not possibly satisfy the final *Hudson* factor.

4. Regarding that factor, the Emergency Order's ban on the display of vaping products is wildly overbroad and thus more excessive than necessary to serve any State interest. The ban is not limited to, nor meaningfully directed at, advertising to minors. It is instead a categorical ban on any display of such products (even solely to adults) within Massachusetts' borders. It is precisely the type of overbroad prohibition on tobacco advertising that the Supreme Court struck down in *Lorillard*. 533 U.S. at 566–68.

## III. THE HARM TO PLAINTIFFS OUTWEIGHS ANY CLAIMED HARM TO GOVERNOR BAKER AND COMMISSIONER BHAREL, AND THE PUBLIC INTEREST FAVORS AN INJUNCTION

As discussed above, Plaintiffs face irreparable harm to their livelihoods and their First Amendment rights if the Court does not enjoin the Emergency Order. Governor Baker and

Commissioner Bharel, on the other hand, will not suffer any appreciable harm if they are enjoined to rescind or stay the ban. Indeed, the only harm to the Governor and the Commissioner would be the *de minimis* cost of communicating with the public that vaping products may continue to be sold and displayed in Massachusetts, pending a determination of the merits of this action. Defendants quickly communicated the ban; they will be able to just as quickly communicate the opposite.

The public, for its part, stands to benefit from an injunction. "The public has no interest in the enforcement of what is very likely an unconstitutional statute." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013). The public *does* have an interest in lifting the Emergency Order's ban to ensure access to vapor products, rather than the more dangerous alternative of combustible cigarettes. Recent studies indicate that a ban on flavored vapor products—which would be more narrow than the Emergency Order—likely will result in an increase in demand for combustible cigarettes.[23]

The Emergency Order's complete freeze on the lawful sale of all vapor products may also create a black market for those products, as Massachusetts Cannabis Control Commissioner Shaleen Title has noted.[24] As has become evident over the last several months, products sold on

---

[23] *E.g.*, Christopher Russel et al., *Changing Patterns of E-Cigarette Flavor Used & Current Flavors Used by 20,836 Adult Frequent E-Cigarette Users in the USA*, 15 Harm Reduction J. 1–14 (2018), *available at* https://rdcu.be/bR9AN; John Buckell et al., *Should Flavours Be Banned in Cigarettes & E-Cigarettes? Evidence on Adult Smokers and Recent Quitters from a Discrete Choice Experiment*, 28 Tobacco Control 168–75 (2019), *available at* https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/2/168.full.pdf.

[24] Naomi Martin, *Amid Vaping Update, Baker Stands by Temporary Ban*, Boston Globe (Sept. 27, 2019 8:13 PM), https://www.bostonglobe.com/metro/2019/09/27/amid-vaping-update-baker-stands-temporary-ban/6rL4M0Hc2kUhLTq6RalREO/story.html (Exhibit 18).

the black market pose a significant health risk,[25] including because they are not subject to federal

ingredient-listing requirements or FDA inspection of manufacturing facilities.[26]  By banning

lawfully sold vapor products, the Emergency Order risks creating the very emergency it

purportedly seeks to eliminate.  At the same time, it will shift the economic benefit of vapor-

product sales to jurisdictions where consumers can still lawfully obtain such products.  The

Emergency Order, despite its salutary intentions, likely will exchange a lawful market of

regulated vapor products for a black market where legitimate products are undifferentiated from

unregulated and potentially dangerous vaping products.

Plaintiffs understand the need for further efforts to study the lung disease that all

evidence indicates is caused by black-market, THC-based vaping products.  But the Emergency

Order sweeps far too broadly to achieve that goal without creating deleterious and unintended

consequences.  Any perceived benefit in outlawing the sale or display of regulated vaping

products sold in retail establishments is readily outweighed by the unintended public health risks

such a ban would create, its infringement upon the Constitutional rights of those in

Massachusetts and around the country who sell or display vapor products, and the significant and

irreparable harm to the many thousands of individuals whose livelihoods depend on the industry.

---

[25] Sun & McGinley, *Most Vaping-Related Lung Injuries Linked to Marijuana* Products, Wash. Post (Exhibit 8).

[26] Cria G. Perrine et al., *Characteristics of a Multistate Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping—United States, 2019*, CDC (cautioning persons who use vaping products against using products "from informal sources or off the street") (Exhibit 10).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court temporarily restrain and preliminarily enjoin Governor Baker and Commissioner Bharel from enforcing the Emergency Order.

Respectfully submitted,


/s/ *William W. Fick*

| | |
|---|---|
| William W. Fick (BBO #650562) | Joseph M. Terry (*pro hac vice forthcoming*) |
| Daniel N. Marx (BBO #674523) | David Randall J. Riskin (*pro hac vice forthcoming*) |
| FICK & MARX LLP | Whitney G. Woodward (*pro vice forthcoming*) |
| 24 Federal Street, 4th Floor | WILLIAMS & CONNOLLY LLP |
| Boston, MA 02110 | 725 Twelfth Street, N.W. |
| Telephone:  (857) 321-8360 | Washington, DC 20005 |
| wfick@fickmarx.com | Telephone:  (202) 434-5000 |
| dmarx@fickmarx.com | jterry@wc.com |
| | driskin@wc.com |
| | wwoodward@wc.com |

*Counsel for Plaintiffs*


October 1, 2019

**CERTIFICATE OF SERVICE**

I certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be served by hand delivery on the defendants at the following addresses on October 2, 2019:

Governor Charlie Baker
Office of the Governor
Massachusetts State House
24 Beacon Street
Boston, MA 02133

Monica Bharel, M.D., Commissioner
Department of Public Health
250 Washington Street
Boston, MA 02108

Attorney General Maura Healey
Office of the Attorney General
One Ashburton Place
Boston, MA  02108

In addition, a copy will be served by e-mail PDF upon:

Timothy J. Casey
Assistant Attorney General
Chief, Administrative Law Division
timothy.casey@mass.gov

/s/ William W. Fick
William W. Fick

October 1, 2019