IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VAPOR TECHNOLOGY ASSOCIATION, IAN DEVINE, DEVINE ENTERPRISE INC., CHRISTOPHER AUSTIN, RISING SUN VAPORS LLC, OHMERICA LLC, ADAM WEBSTER, THE STEAM CO. LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLIE BAKER, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS, AND MONICA BHAREL, M.D., IN HER OFFICIAL CAPACITY AS DEPARTMENT OF PUBLIC HEALTH COMMISSIONER,<br><br>Defendants. | No. 19-cv-12048-IT |

**FIRST AMENDED COMPLAINT**

Vapor Technology Association ("VTA"); Ian Devine and his corporation Devine Enterprise, Inc.; Christopher Austin and his corporations Rising Sun Vapors LLC and Ohmerica LLC; Adam Webster and his corporation The Steam Co. LLC (collectively, the "Retailer Plaintiffs," and with VTA, "Plaintiffs"), bring this complaint against Defendants Charlie Baker, solely in his official capacity as Governor of the Commonwealth of Massachusetts, and Monica Bharel, M.D., solely in her official capacity as Massachusetts Department of Public Health Commissioner, to enjoin and declare as unconstitutional an Emergency Order issued by Commissioner Bharel, that will destroy Massachusetts's $331 million nicotine-vapor-products industry, will ruin the livelihoods of the 2,500 workers that it employs, and will result in significant damage to out-of-state sellers of vapor products.

## NATURE OF THE ACTION

1. This is an action seeking a declaratory judgment, a permanent injunction, and all other appropriate relief to set aside as unconstitutional the "Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019, Declaration of a Public Health Emergency" ("Emergency Order").

2. The Emergency Order, issued without any opportunity for public comment or scientific support, states that:

> The sale or display of all vaping products to consumers in retail establishments, online, and through any other means, including all non-flavored and flavored vaping products, including mint and menthol, including tetrahydrocannabinol (THC) and any other cannabinoid, is prohibited in the Commonwealth.[1]

It thus prohibited the sale of *any and all* vaping products in Massachusetts whether by a Massachusetts or out-of-state seller.  So too did it purport to ban even the advertisement of vaping products, whether physically, online, or through other means.

3. The Emergency Order makes no distinction between vaping products that contain THC, a psychoactive component of marijuana, which is linked to a multistate outbreak of illness, and vaping products containing only nicotine, such as the products sold by Retailer Plaintiffs and other VTA members.  Similarly, it makes no distinction between the black-market vaping products at the center of that outbreak, and the FDA-regulated products produced by legitimate manufacturers.  And while purporting to target the problem of youth vaping, the Emergency Order contains no provisions expressly directed at children.  Instead, the Emergency Order implements a categorical ban on the sale of vaping products to all persons, threatening to destroy

---

[1] Commissioner of Public Health, *Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019 Declaration of a Public Health Emergency* (Sept. 24, 2019), *available at* https://www.mass.gov/files/documents/2019/09/24/Order-of-the-Commissioner-of-Public-Health-Vaping-Products-9-24-19.pdf ("Emergency Order") (Exhibit 1).

an entire industry and the livelihoods of Massachusetts citizens.

4. The Emergency Order took effect immediately upon issuance, and, by its terms, will remain in place until January 25, 2020, unless Governor Baker or Commissioner Bharel take further action.

5. The sudden enactment of this far-reaching ban has upended the vaping industry in Massachusetts and caused confusion and uncertainty among consumers and retailers alike.

6. Plaintiffs filed suit on October 1, 2019, to enjoin and declare unconstitutional the Emergency Order. The suit alleged that the Emergency Order violated both the dormant Commerce Clause and the First Amendment.

7. Two days later, before even responding to Plaintiffs' suit, Commissioner Bharel issued another order, this one interpreting (and in effect narrowing) the Emergency Order. According to Commissioner Bharel, that "Implementation Order" "is intended to ensure clarity for businesses subject to the Emergency Order and uniformity in enforcement."[2] The Implementation Order states that the "Emergency Order prohibits the sale of vaping products in Massachusetts," and that its "ban on display of vaping products applies only to the physical display of vaping products in retail establishments in Massachusetts."

8. Notwithstanding the fact that the Emergency Order, as interpreted by the Implementation Order, purports to apply only to entities and individuals of Massachusetts, its scope and reach are national. The Emergency Order thus unconstitutionally burdens interstate commerce.

---

[2] Commissioner of Public Health, *Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019 Declaration of a Public Health Emergency* (October 3, 2019), *available at* https://www.mass.gov/guides/vaping-public-health-emergency ("Implementation Order) (Exhibit 2).

9.      For these reasons, and those explained further below, the Court declare unconstitutional, permanently enjoin the enforcement of, and vacate the Emergency Order.

## PARTIES

10.     Plaintiff Vapor Technology Association is a national non-profit industry trade association with a principal place of business at 1201 Pennsylvania Avenue NW, Suite 530, Washington D.C., 20004.  The VTA is the industry's leading national trade association, and has more than 1,000 members, including members in Massachusetts.  Nationwide, the VTA's members include nicotine-vapor-device manufacturers; manufacturers of nicotine-containing e-liquids, flavorings, and components; and wholesale, importing, e-commerce, and brick-and-mortar retailers. The VTA represents the needs and concerns of its members in promoting public policies and safety standards for the vapor industry.  The VTA has a vital interest in ensuring that any regulation of nicotine vapor products imposed by the Commonwealth of Massachusetts is consistent with Constitutional and statutory requirements.  VTA's members do not manufacture or sell THC-based products.

11.     Plaintiff Ian Devine is a resident of Mansfield, Massachusetts, who owns Devine Enterprise Inc.

12.     Plaintiff Devine Enterprise, Inc. is a Massachusetts corporation that owns and operates two vapor products retail stores, located in Mansfield, Massachusetts and Walpole, Massachusetts.  Devine Enterprise sells nicotine vapor products.

13.     Plaintiff Christopher Austin is resident of Merrimac, Massachusetts, who owns four vaping products stores in New Hampshire, including two stores near the Massachusetts-New Hampshire border.  Plaintiff owns these vapor products stores through his ownership of Plaintiffs Rising Sun Vapors LLC and Ohmerica LLC.  He obtains products for resale from a

wholesale vendor in Massachusetts.  Austin's stores sell nicotine vapor products.

14. Plaintiff Rising Sun Vapors LLC is a New Hampshire corporation that owns Route 1 Vapors, a vapor-products shop at 779 Lafayette Road, Seabrook, New Hampshire, 03874, and is owned by Mr. Austin.  Rising Sun Vapors LLC sells nicotine vapor products.

15. Plaintiff Ohmerica LLC is a New Hampshire corporation which owns Route 28 Vapors, a vapor-products shop at 294 North Broadway, Salem, New Hampshire, 03079, and is owned by Mr. Austin.  Ohmerica LLC sells nicotine vapor products.

16. Plaintiff Adam Webster is a Connecticut resident and the owner of vaping-products stores in Connecticut named The Steam Co. LLC..  Mr. Webster ships vaping products into Massachusetts and derives income through sales of his vaping products in Massachusetts.  Mr. Webster's stores sell nicotine vapor products.

17. Plaintiff The Steam Co. LLC, a Connecticut corporation owned by Mr. Webster, owns his vapor-products stores.  The Steam Co. sells nicotine vapor products and ships vaping products into Massachusetts.

18. Defendant Charlie Baker is the Governor of the Commonwealth of Massachusetts.  Upon information and belief, Governor Baker maintains an office at the Massachusetts State House, 24 Beacon Street, Office of the Governor, Room 280, Boston, Massachusetts, 02133.

19. Defendant Monica Bharel is the Commissioner of the Massachusetts Department of Public Health.  Upon information and belief, Commissioner Bharel maintains an office at the Massachusetts Department of Public Health, 250 Washington Street, Boston, Massachusetts, 02108.

**JURISDICTION AND VENUE**

20.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution of the United States.

21.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, authorizes the declaratory and other relief Plaintiffs seek in this action.

22.     Venue in proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendants reside in this district and because a substantial part of the events giving rise to this claims occurred within this district.

23.      VTA has standing to bring this action because its members would otherwise have standing to sue in their own right, and because the interests VTA seeks to protect are germane to the organization's purpose of ensuring the continued availability of high-quality nicotine vapor products to adult consumers in the United States and Massachusetts.  Retailer Plaintiffs are members of VTA.

24.     This case is ripe for adjudication because it presents an actual, justiciable controversy between Plaintiffs and Defendants, which requires a declaration of rights by this Court as well as injunctive relief to prohibit Defendants from violating federal law and regulation and abridging Plaintiffs' rights.

**FACTUAL BACKGROUND**

**I.     VAPING PRODUCTS ARE AN ALTERNATIVE TO MORE DANGEROUS PRODUCTS, LIKE CIGARETTES**

25.     Vaping devices (known also as "e-cigarettes") are handheld electronic devices that are used to heat and aerosolize a liquid mixture containing nicotine, cannabis-derived,[3] or

---

[3] Plaintiffs do not offer cannabis products and do not challenge the Emergency Order to the extent it bans such products.

other ingredients.[4] The vaping devices offered by Retailer Plaintiffs and VTA's members use nicotine. These products are referred to as Electronic Nicotine Delivery Systems.

26. When using a vaping device, the user inhales the aerosolized "vapor" as he or she would inhale actual tobacco smoke, but without the fire, flame, tar, carbon monoxide, or ash associated with traditional "combustible" cigarettes.[5]

27. Vaping products, which first gained popularity in the United States around 2009, present an alternative to combustible cigarettes. Indeed, many users of vaping products are current or former smokers.[6]

28. Research indicates that vaping poses substantially less risk than combustible cigarettes and may significantly reduce the public health harms associated with smoking. For example:

>     a. A study conducted by the National Academies of Sciences, Engineering and Medicine, commissioned by FDA, found that evidence suggests that "across a range of studies and outcomes, e-cigarettes pose less risk to an individual than combustible cigarettes."[7]
>
>     b. The United Kingdom's Royal College of Physicians advised that "the hazard to health arising from long-term vapour inhalation from the e-cigarettes

---

[4] CDC, *About Electronic Cigarettes (E-Cigarettes)* (last revised Nov. 15, 2018), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/about-e-cigarettes.html (Exhibit 3).

[5] *See* Lee Smith et al., *E-Cigarettes: How 'Safe' Are They?*, 65 J. Fam. Practice 380 (June 2016), *available at* https://mdedge-files-live.s3.us-east-2.amazonaws.com/files/s3fs-public/issues/articles/content_a1a70ef370918fd2ba_JFP_06506_Article1.PDF.

[6] Nicholas Bakalar, *From 0 to 10 Million: Vaping Takes Off in the U.S.*, N.Y. Times (Aug. 31, 2018), https://www.nytimes.com/2018/08/31/health/vaping-cigarettes-nicotine.html (reporting that 54.6 percent of e-cigarette users also smoked cigarettes and that 30.4 percent of e-cigarette users had quit smoking cigarettes, according to a study by the CDC) (Exhibit 4).

[7] Kathleen Stratton et al., *Public Health Consequences of E-Cigarettes*, Nat'l Acad. Sci., Eng'r & Med. 12 (2018), *available at* https://www.ncbi.nlm.nih.gov/books/NBK507171/pdf/Bookshelf_NBK507171.pdf.

available today is unlikely to exceed 5% of the harm from smoking tobacco."[8]

c.  A Georgetown University study concluded that switching from traditional cigarettes to vaping products would prevent millions of premature deaths over 10 years in the United States.[9]

d.  A randomized clinical study published in the *New England Journal of Medicine* found that cigarette smokers were more likely to quit smoking when using e-cigarettes than when using nicotine-replacement therapies.[10]

29.  The availability of vaping products has coincided with a drop in demand for traditional cigarettes. The CDC reports that the number of adult smokers as a percentage of the United States population dropped from 20.6% in 2008 to 14% as of 2017.[11]

## II.  VAPING PRODUCTS ARE REGULATED AT THE FEDERAL AND STATE LEVEL

30.  The Food and Drug Administration, pursuant to federal law, regulates nicotine vaping products. For instance, as of August 8, 2016, it became illegal to sell vaping products and other related products to people under the age of 18.[12] As of June 2019, FDA required

---

[8] Royal College of Physicians Tobacco Advisory Group, *Nicotine Without Smoke: Tobacco Harm Reduction* (2009), *available at* https://www.rcplondon.ac.uk/projects/outputs/nicotine-without-smoke-tobacco-harm-reduction-0.

[9] Daniel T. Levy et al., *Potential Deaths Averted in USA by Replacing Cigarettes with E-Cigarettes*, 27 Tobacco Control 1 (2017), *available at* https://tobaccocontrol.bmj.com/content/27/1/18.

[10] Peter Hajek et al., *A Randomized Trial of E-Cigarettes Versus Nicotine-Replacement Therapy*, 380 New Eng. J. Med. 629–37 (2019), *available at* https://www.nejm.org/doi/10.1056/NEJMoa1808779.

[11] CDC, Morbidity & Mortality Weekly Report, *Cigarette Smoking among Adults & Trends in Smoking Cessation—United States, 2008* (Nov. 13, 2009), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5844a2.htm (Exhibit 5); CDC, *Current Cigarette Smoking Among Adults in the United States* (last revised Feb. 4, 2019), https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (Exhibit 6).

[12] FDA, *How FDA Is Regulating E-Cigarettes* (updated Sept. 10, 2019), https://www.fda.gov/news-events/fda-voices-perspectives-fda-leadership-and-experts/how-fda-regulating-e-cigarettes (Exhibit 7).

manufacturers of vaping products to comply with certain requirements, including submitting lists of products, including labeling and advertisements, as well as submitting ingredient listings.[13] FDA also conducts inspections of certain vaping-products manufacturers and retailers.[14] FDA also has created certain education and enforcement programs to prevent use of vaping products, focused on children and teens.[15] Finally, acknowledging that vaping products are "still relatively new," FDA supports and funds research to evaluate the public health impact of these products at both the population and individual level.[16]

31. No such federal regulatory oversight exists for THC-based vaping products or other cannabis-related products. Thus, for example, manufacturers of THC-vaping devices, unlike the manufacturers of electronic nicotine delivery systems, do not provide FDA with an ingredients list.

32. Massachusetts also imposes requirements for the purchase and sale of vaping products, including by prohibiting the sale or provision of nicotine vaping products to individuals under 21 years of age. Mass. Gen. Laws c. 270, § 6(a), (b).

33. The Massachusetts legislature also has proposed but not enacted other limitations on vaping products, including a ban on flavored nicotine vaping products this year. S.B. 1279, 191st Gen. Ct. Mass. (2019); H.B. 1902, 191st Gen. Ct. Mass. (2019).

**III. THE VAPING INDUSTRY IS A DYNAMIC PART OF THE NATIONAL AND STATE ECONOMY**

34. The vaping-products industry, which employs approximately 166,000 people, is a

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

"dynamic part of the U.S. economy, accounting for $24.46 billion annually in economic output." (Declaration of John Dunham (Sept. 30, 2019), ¶ 5 (Exhibit 8).)

35.  Of that, $331,428,500 is traceable to Massachusetts, where the vapor products industry generates jobs for approximately 2,530 individuals. (Dunham Decl. ¶ 6.) Those individuals include the employees of eight vapor products manufacturers, one liquid-mixture manufacturer, and 221 retail vape shops. (Dunham Decl. ¶ 7.)

36.  Massachusetts vapor products companies and sellers, and their employees, contribute $18,982,100 in Massachusetts state taxes; consumers of vaping products generate a further $10,773,000 in sales taxes. (Dunham Decl. ¶ 9.)

**IV.  THC AND BLACK-MARKET VAPING PRODUCTS HAVE BEEN LINKED TO A MULTISTATE OUTBREAK OF LUNG INJURIES**

37.  Federal and state health officials have identified and are investigating a multistate outbreak of lung injury associated with vaping products, linked to products containing THC.

38.  For example, on September 5, 2019, the New York Department of Public Health, reported that it had received "34 reports from New York State physicians of severe pulmonary illness among patients ranging from 15 to 46 years of age who were using at least one cannabis-containing vape product before they came ill."[17] It also reported that laboratory tests results found "very high levels" of vitamin E acetate—an oil included in THC vapor products to address some of the attributes of cannabis wax—in "nearly all cannabis-containing samples" analyzed.[18] The Department found that "[a]t least one vitamin E acetate containing product has been linked

---

[17] N.Y. Dep't of Health, *New York State Department of Health Announces Update on Investigation into Vaping-Associated Pulmonary Illnesses* (Sept. 5, 2019), https://www.health.ny.gov/press releases/2019/2019-09-05_vaping.htm (Exhibit 9).

[18] *Id.*

to each patient who submitted a product for testing."[19]

39. The next day, the CDC reported that its "[i]nitial findings" showed that "many of the patients . . . reported recent use of THC-containing products."[20]

40. On September 27, 2019, the CDC reported that "[t]he latest findings from the investigation into lung injuries associated with e-cigarette use, or vaping, suggest products containing THC play a role in the outbreak."[21] The CDC reported that the vast majority of persons with affected with a lung injury—about 77 percent—reported using THC-containing products.[22]

41. Moreover, the CDC has noted that the most of the patients in Illinois and Wisconsin presenting such lung injury reported using illicit THC-containing products sold as prefilled cartridges and obtained from informal sources.[23] It also observed the likelihood that some patients may have failed to disclose to health officials their use of THC because of its legal status.[24]

42. Although the CDC has not definitively identified a single brand or product as the cause of illness, it has found that a high percentage of patients have reported using cartridges

---

[19] *Id*.

[20] CDC, *Initial State Findings Point to Clinical Similarities in Illnesses Among People Who Use E-Cigarettes or 'Vape'* (Sept. 6, 2019, at 1:00PM), https://www.cdc.gov/media/releases/2019/p0906-vaping-related-illness.html (Exhibit 10).

[21] CDC, *Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping* (Sept. 27, 2019, 1:00 PM), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html (Exhibit 11).

[22] *Id.*

[23] Isaac Ghinai et al., Morbidity & Mortality Weekly Report, *E-Cigarette Product Use, or Vaping, Among Persons with Associated Lung Injury—Illinois & Wisconsin, April–September 2019*, CDC, Morbidity & Mortality Weekly Report (Sept. 27, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/mm6839e2.htm (Exhibit 12).

[24] *Id*.

from "Dank Vapes," a prominent counterfeit brand, which contain THC.[25]  The CDC emphasized that "the high level of use of prefilled THC cartridges, used in a range of different devices, suggests that the cartridges might play an important role."[26]

43. And as of October 17, 2019, CDC reports that "[t]he latest national and state findings suggest products containing THC, particularly those obtained off the street or from other informal sources (e.g. friends, family members, illicit dealers), are linked to most of the cases and play a major role in the outbreak."[27]

44. FDA has stated that "[t]hrough [its] investigation, we have also found most of the patients impacted by the[] illnesses reported using THC-containing products, suggesting THC vaping products play a role in the outbreak."[28]  Indeed, "[a] majority of the samples tested by states or by the FDA as part of this ongoing investigation have been identified as vaping products containing THC."[29]

## V. MASSACHUSETTS'S BAN PROHIBITS ALL VAPING PRODUCTS, WHETHER OR NOT THEY CONTAIN THC

45. On September 24, 2019, Governor Baker issued a "Declaration of Emergency," pursuant to Massachusetts General Laws chapter 17, Section 2A, concerning vaping.[30]

---

[25] *Id.*

[26] *Id.*

[27] CDC, *Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping* (revised Oct. 17, 2019), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html. (Exhibit 13).

[28] FDA, *Lung Illnesses Associated with Use of Vaping Products* (revised Oct. 16, 2019), https://www.fda.gov/news-events/public-health-focus/lung-illnesses-associated-use-vaping-products.  (Exhibit 14).

[29] *Id.*

[30] Office of the Governor, *Governor's Declaration of Emergency* (Sept. 24, 2019), *available at*

46. The Declaration referenced a "multistate outbreak of severe lung disease associated with the use of vaping products including but not limited to e-cigarettes" and being investigated by federal, state, and local health departments. (Emergency Declaration 1.)

47. The Declaration stated that as of September 19, 2019, the CDC reported "530 cases across 38 states and U.S. territories, including seven fatalities in six different states." (Emergency Declaration 1.)

48. It further noted that "all reported cases have a history of vaping" and a history of using vaping products containing THC, nicotine, or a combination of the two, while nevertheless acknowledging that "the specific cause of this disease is unknown." (Emergency Declaration 1.)

49. The Declaration stated that since September 11, 2019, when the Massachusetts Commissioner of Public Health "declared cases of unexplained vaping-associated pulmonary disease to be immediately reportable" to the state Department of Public Health, "more than 60 Massachusetts residents have already been reported with lung injury potentially related to vaping." (Emergency Declaration 2.) It noted that five of those cases met "the CDC case definition of confirmed or probable cases." (Emergency Declaration 2.)

50. The Declaration also cited national statistics about vaping usage by "youth" from 2017 and 2018. (Emergency Declaration 1.) It further stated that "Massachusetts youth usage mirrors national trends with 41% of all youth in 2017 reporting trying e-cigarettes and one in five reporting that they use e-cigarettes regularly." (Emergency Declaration 2.)

51. In light of the foregoing, the Governor stated that "[i]t is necessary for the [Department of Public Health] to take action immediately to address this public health

---

https://www.mass.gov/files/documents/2019/09/24/Governors-Declaration-of-Emergency.pdf, ("Emergency Declaration") (Exhibit 15).

emergency," and declared that "an emergency exists which is detrimental to public health in the Commonwealth." (Emergency Declaration 2.)

52. That same day, Department of Public Health Commissioner Monica Bharel, with the approval of Governor Baker and the Massachusetts Public Health Council, issued an emergency order pursuant to Governor Baker's Emergency Declaration and Massachusetts General Laws, chapter 17, Section 2A.

53. Commissioner Bharel's Emergency Order stated: "The sale or display of all vaping products to consumers in retail establishments, online, and through any other means, including all non-flavored and flavored vaping products, including mint and menthol, including tetrahydrocannabinol (THC) and any other cannabinoid, is prohibited in the Commonwealth." (Emergency Order 1.)

54. While purporting to target the problem of youth vaping usage, the Emergency Order does not focus on minors, instead completely banning vaping products in Massachusetts.

55. The Emergency Order defined "[v]aping products" as products "intended for human consumption by inhalation regardless of nicotine content . . . that relies on vaporization or aerosolization," and "any component, part or accessory of a product or device" of such products. (Emergency Order 1.)

56. The Emergency Order authorized the Department of Public Health to "take any enforcement action permitted by law or this Order to effectuate this Order as it applies to sales of vaping products to consumers." (Emergency Order 1.) It further provided that its terms "may be enforced in the manner of a regulation" adopted pursuant to state law or "by injunction," and that, subject to a valid court order, state and local law enforcement officers "may seize any vaping products from entities or persons that continue to display or sell vaping products in

violation of this Order." (Emergency Order 1.)

57. In addition, the Emergency Order stated that persons and entities found in violation of the Order "may also be subject to the maximum fine" provided in Massachusetts General Laws chapter 111, § 31. (Emergency Order 1.)

58. This Emergency Order took effect immediately, and, by its terms, remains in effect through January 25, 2020, unless extended or the declared public health emergency is terminated. (Emergency Order 1–2.)

59. Commissioner Bharel subsequently issued an Implementation Order purportedly narrowing the Emergency Order.

60. *First*, the Implementation Order stated that the "Emergency Order prohibits the sale of vaping products in Massachusetts." (Implementation Order.) It then provided further detail about what that anodyne phrase meant:

> a. "A seller located in Massachusetts may <u>not</u> make an in-store sale of vaping products to a consumer located in Massachusetts."
>
> b. "A seller located in Massachusetts or a seller located in any other State may <u>not</u> make a sale of vaping products by online, phone, or other means for delivery to a consumer located in Massachusetts."
>
> c. "A seller located in Massachusetts may make a sale of vaping products by online, phone, or other means for delivery to a consumer located in another State."

61. *Second*, the Implementation Order represented that "[t]he Emergency Order's ban on the display of vaping products applies only to the physical display of vaping products in retail establishments in Massachusetts." (Implementation Order.) The Emergency Order does not, according to the Implementation Order, "apply to the online 'display' of vaping products" or "limit the advertisement of vaping products." (Implementation Order.)

62. Even as interpreted by the Implementation Order, the Emergency Order makes no

15

distinction between vaping products that contain THC and those that do not, notwithstanding information reported by health officials investigating the outbreak of illness. It makes no distinction between black-market vaping products marketed under counterfeit brands, and the federally regulated electronic nicotine delivery systems products sold or produced by legitimate retailers and manufacturers.

## VI. THE BAN HAS DEVASTATED THE VAPOR INDUSTRY AND WILL CONTINUE TO DO SO

63. The Emergency Order rendered Massachusetts's vaping industry (and the business of those who ship into Massachusetts) illegal.

64. Upon its issuance, retailers began receiving cease-and-desist letters and had no choice but to close their operations in light of the potential penalties. (Declaration of Ian Devine (Sept. 29, 2019), ¶ 2 (Exhibit 16).)

65. In the days after the ban took effect, it ravaged the vaping industry by forcing business owners to shut their doors and order their employees to stay home. Each day that the ban remains in effect, business owners lose income and employees miss out on paychecks. The effects of the ban—still in its infancy now—will soon be utterly devastating for this industry and the 2,500 individuals it employs, should it be allowed to run its full four months. (Dunham Decl. ¶ 10.)

66. For example, Devine Enterprise operated two retail stores—one in Mansfield and another in Walpole—until Thursday, September 26, 2019, when the ban on sales of all vapor products, followed by a cease and desist letter, left Devine Enterprise with no choice but to close its doors. (Devine Decl. ¶ 2.)

67. Devine Enterprise, like many vapor products companies, is a small business. Its owner personally guaranteed long-term leases for both locations—leases for which he now will

be held personally liable because Devine Enterprise can longer generate revenue. (Devine Decl. ¶ 3.)  As a result, absent an injunction Devine Enterprise likely will lose its retail spaces.  It will also be required to lay off all of its employees.  (Devine Decl. ¶ 10.)

       68.     That story is being replicated in shop after shop across Massachusetts.

       69.     As long as the ban remains in place, the damage will only grow as employees and businesses, deprived of any income, are increasingly unable to meet their financial obligations.  With retail stores remaining closed, the entire supporting ecosystem of wholesalers, distributers, and manufacturers, will collapse as well, resulting in irreparable injury to industry members in Massachusetts and throughout the country.

       70.     The far-reaching harm is not limited to Massachusetts citizens.  Consider Plaintiff Christopher Austin, a Massachusetts resident who purchases inventory from a Massachusetts wholesaler.  (Declaration of Christopher Austin (Sept. 30, 2019), ¶¶ 6, 8 (Exhibit 17).)  The far-reaching ban jeopardizes Mr. Austin's businesses through its effect on his trusted, Massachusetts-based supplier.  (Austin Decl. ¶¶ 9–10.)

       71.     Plaintiff Adam Webster and his Connecticut vaping products stores stand to lose income by prohibiting them from shipping products into Massachusetts.  (Declaration of Adam Webster (Sept. 3, 2019), ¶¶ 3–4 (Exhibit 18).)

       72.     By denying Massachusetts residents access to vaping products from established retailers, the ban, according to Massachusetts Cannabis Control Commissioner Shaleen Title, "mak[es] harmful bootleg products the only option."[31]  As Title noted, there is no evidence even

---

[31] Naomi Martin, *Amid Vaping Update, Baker Stands by Temporary Ban*, Bos. Globe (Sept. 27, 2019, at 8:13 PM), https://www.bostonglobe.com/metro/2019/09/27/amid-vaping-update-baker-stands-temporary-ban/6rL4M0Hc2kUhLTq6RalREO/story.html (Exhibit 19).

suggesting that any licensed vapor product from Massachusetts has caused any harm.[32]

73. Defendants have refused to remove or modify the ban in spite of its deleterious effects on businesses and employees located inside and outside Massachusetts, and notwithstanding additional information indicating the link between pulmonary illnesses and THC vaping products.[33]

## COUNT I: DORMANT COMMERCE CLAUSE
## U.S. Const. Art. I, § 8

74. Plaintiffs fully incorporate each of the preceding paragraphs 1–73 as if fully set forth herein.

75. The Commerce Clause affirmatively grants Congress the power to regulate commerce among the states, and, through its negative or "dormant" implication, prohibits state laws and regulations which unduly restrict interstate commerce.

76. The Emergency Order, as interpreted by the Implementation Order, imposes significant burdens on interstate commerce in violation of the dormant Commerce Clause by regulating commerce outside of Massachusetts and between Massachusetts and other states.

77. The burden imposed on interstate commerce by the Emergency Order is clearly excessive in relation to the putative local benefits offered by Defendants. The Emergency Order, while purporting to address the recent outbreak of illness associated with vaping products, makes no distinction between vaping products that contain THC, linked to a multistate outbreak of illness, and vaping products containing only nicotine. Nor does it makes a distinction between "black-market" vaping products marketed under counterfeit brands and those produced by

---

[32] *Id.*

[33] *Id.*

legitimate manufacturers.

      78.     Plaintiffs have no adequate remedy at law.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

      a.     A declaration under 28 U.S.C. § 2201 that the Emergency Order violates the U.S. Constitution;

      b.     Permanent injunctive relief and vacatur of the Emergency Order and any enforcement actions carried out by Defendants or at their direction pursuant to the Emergency Order or, in the alternative, permanent injunctive relief to prevent Defendants from enforcing the Emergency Order;

      c.     An award of the Plaintiffs' costs, expenses, and reasonable attorney's fees; and

      d.     Any such relief as the Court may deem just and equitable.

Respectfully submitted,

/s/ *William W. Fick*

| | |
|---|---|
| William W. Fick (BBO #650562) | Joseph M. Terry (*admitted pro hac vice*) |
| Daniel N. Marx (BBO #674523) | David Randall J. Riskin (*admitted pro hac vice*) |
| FICK & MARX LLP | Whitney G. Woodward (*admitted pro hac vice*) |
| 24 Federal Street, 4th Floor | WILLIAMS & CONNOLLY LLP |
| Boston, MA 02110 | 725 Twelfth Street, N.W. |
| Telephone: (857) 321-8360 | Washington, DC 20005 |
| wfick@fickmarx.com | Telephone: (202) 434-5000 |
| dmarx@fickmarx.com | jterry@wc.com |
| | driskin@wc.com |
| | wwoodward@wc.com |

*Counsel for Plaintiffs*

October 18, 2019

## **CERTIFICATE OF SERVICE**

      I certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 18, 2019.

                                    */s/ William W. Fick*
                                    William W. Fick